Court of Appeals for the Second Circuit. Hear ye, hear ye, hear ye. All persons have been business before this. The State Attorney of the United States Court of Appeals for the Second Circuit, Drew Neard, give your attention and ye shall be heard. Thank you everybody and welcome. We appreciate your doing this special video oral argument. We're here in docket number 21-636, the case is National Rifle Association v. Maria Vullo and I think with that we will turn it over to Mr. Haverman. You're arguing for the appellate? That's right. Good afternoon. Good afternoon, your honors and may it please the court. Will Haverman on behalf of Maria Vullo. I'd like to reserve three minutes for rebuttal if I may. When this case was first on appeal, this court reached two separate and independent holdings. The court first held that the NRA failed to plausibly allege the constitutional violation but this court proceeded to hold, quote, even assuming the NRA sufficiently pleaded that Vullo engaged in unconstitutionally coercive or threatening conduct, Vullo is nonetheless entitled to qualified immunity because the law was not clearly established and the Supreme Court did not grant review of that qualified immunity. The Supreme Court in 2024 retroactively provided guidance or notice to Ms. Vullo that this court already held was missing in the year 2018 and the best evidence that the unconstitutionality of the alleged conduct here was not clearly established is that a unanimous panel of this court concluded that it was not unconstitutional in the first place and it would really go against the bedrock principles of qualified immunity and the purposes of qualified immunity and impose a chilling effect on public officials to subject them to money damages for failing to identify a constitutional principle that three judges of this court did not identify. As I understand the Supreme Court's analysis, it wasn't so much concerned that this court had failed to understand the applicable legal principle. It's that this court, when we looked at it the first time around, failed to give sufficient deference to the complaint and the inferences to be drawn there from and once we understood, I'm now quoting what I think the Supreme Court said, once we properly understand the complaint it becomes an easy case that doesn't break any legal ground. How do we respond to that statement from the Supreme Court? Sure, so I think there are two important responses to that statement. It's true, of course, the Supreme Court said it broke no new ground, but I would just direct the court to the sentence that immediately follows that sentence at page 18 of the slip opinion, which is, you know, it applies, what it was doing was applying, quote, the general principle from Banton Books to a new factual circumstance and if that language sounds familiar to the court, general principle, it's because it's basically the precise formulation that the Supreme Court has said over and over again isn't at the right level of generality to defeat qualified immunity and the qualified immunity is more particularized. To use the Supreme Court's language, the inquiry must be undertaken in the light of the specific context of the case and not as a broad general proposition. So the fact that, and I think, you know, this court's prior opinion in this case recognized that as a general matter, it was clearly established that the First Amendment prohibits threats to stifle speech, but the sort of where the rubber hit the road in the case is whether it would be clear to any reasonable official in the year 2018 when Ms. Rouleau is alleged to have acted here that the conduct alleged would amount to a coercive threat and court. How is the conduct in this case different from the conduct in some of the other cases of Banton Books and the cases that followed it? Sure, so we've identified a number of distinctions in the brief and I'd like to focus on two here. The first is that here you're dealing with an entity, Ms. Rouleau was dealing with an entity who conceded that they had violated the law and she was in effect negotiating the resolution of conceded lawbreaking with respect to a dangerous insurance product and we didn't, we don't have anything like that in Banton Books and this court doesn't have anything like that in any of its precedents. In Banton Books you had conduct, books that were at least arguably obscene in violation of the law. That's true, of course, and that's what the Supreme Court said for purposes of the constitutional analysis, but you didn't have conceded lawbreaking conduct in that case and the whole sort of gravamen of the Supreme Court's decision in Banton Books was that, of course, the Rhode Island scheme in that case was hopelessly overbroad and it swept in all sorts of protected speech that wasn't obscene under state law and so, you know, moving forward, of course, after the Supreme Court's decision in this case, the law will be clearly established under comparable facts but Banton Books didn't clearly establish it and then the second point I'd just like to make, which I think is related to that point, Judge Chin, is, you know, I think the point that Justice Jackson made in her concurrence in the case, which is that this, the conduct at issue here is more attenuated to speech than the conduct in Banton Books or any of the cases applying it. You know, in Banton Books you had a state scheme to censor books. In Okweti, it was a billboard with a religious message. In Ratner, it was a newspaper and here the allegation isn't like that. There's no particular speech that the NRA alleges Ms. Vullo stifled or censored. Rather, the allegation at paragraph 21 of their complaint is her conduct interfered with the NRA's business relationships and that made it harder for the NRA to express itself or may have retaliated against the NRA for its prior speech. It's not entirely clear what the theory is. Is this not, is it not indirect coercion of speech by pushing the insurance companies not to do business that somehow deters the NRA from engaging fully in speech? That is what the Supreme Court held as a constitutional matter. So as a constitutional question under the First Amendment, they held that the NRA plausibly alleged First Amendment violation, but the relevant question for this court is not whether they alleged a constitutional violation by indirectly coercing or stifling speech, but rather precedent in existence at the time Ms. Vullo is alleged to have acted would have clearly established that principle. Doesn't the majority of the Supreme Court suggest that the particular allegations about Ms. Vullo's interactions with Lloyd, which I understand she contests, were kind of pivotal to the interaction that she was having in an effort to undercut the NRA's ability to deliver its message by stopping insurance coverage for all of its operations? I mean they refer to it repeatedly as coercive and that's a contested fact and I wondered if since the Supreme Court seems to see that as pivotal to the plausibility of the whether that doesn't mean we should send it back for resolution on summary judgment to give Ms. Vullo a chance to establish her own bona fides in the communications and exactly what occurred. Sure, so we don't think a remand is necessary or appropriate. Of course, the court remands we're confident will prevail for that reason, but we can accept the allegations of the complaint as true. We can accept the allegation that, you know, this was coercive as the Supreme Court found and nonetheless, on the face of the complaint, it is clear that no precedent in existence at the time she is alleged to have done this would have put her on notice. Clear, you know, beyond debate is the language that the Supreme Court has used that that would be construed to be coercive under the circumstances I was discussing with Judge Chin where, you know, you have conceded violations of the law where the speech is more conduct is more attenuated to speech and the like and so we just don't understand the Supreme Court's opinion to have opined on that specific question and we don't think a remand is necessary. I'm wondering whether in framing it that way you're asking us to push back a little bit on the reframing that the Supreme Court did relative to how this court previously characterized the facts. I don't think the Supreme Court would describe the facts with all the inferences we're supposed to draw the way that you just did. It describes the facts as her power to threaten enforcement actions against DFS regulated entities in order to punish or suppress the NRA's gun promotion advocacy. That's a different description than what you just described about, you know, lawful products and enforcement discretion and things like that. Isn't that the question we have to sort of ask ourselves? I think so, but I don't think that anything that I have said here or articulated is in conflict with what the Supreme Court said. So I think it is common ground and Mr. Francisco can correct me if I'm wrong, but I think it's common ground that the insurance products at issue here were unlawful and I therefore think it's common ground that pursuing, you know, enforcement action against Lloyd's for those unlawful products was objectively reasonable and the thing that the NRA says makes this case different is that she did it for a subjectively, you know, retaliatory purpose. And with respect to that, I would just say, you know, that of course matters for purposes of the First Amendment inquiry, but for purposes of qualified immunity, the Supreme Court has said over and over again, the defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense. So there are a number of other cases that say the same thing. So for purposes of the qualified immunity question, the fact that this was objectively reasonable law enforcement content, even accepting as true that there may have been, you know, their allegation that there was a retaliatory or improper motive does not take this case out, you know, does not put on notice any reasonable official acting in 2018 that this would be impermissible. I see that my time is up. I hope I reserved a little bit of time for rebuttal, but thank you. Yes, thank you. Mr. Francisco. Judge Robinson, and may it please the court, as the Supreme Court held properly construed, this complaint alleges that Ms. Vullo, and I quote, coerced DFS regulated entities into dissociating with the NRA in order to punish or suppress the NRA's gun promotion advocacy. And it continued that she quote, pressured regulated entities to help her stifle the pro-gun advocacy by threatening enforcement actions against those entities that refused to dissociate with the NRA. If those allegations are true, then it plainly violates clearly established law. I'm sorry to jump in. I just, one of the things that I'm, I'm trying to clarify here is when we're talking about dissociating with the NRA is the allegation that defendant said provide no insurance products whatsoever, or that you cease this particular category of sort of affinity program insurance. I'm just curious about the scope of the, of the impediment here. Well, I think that if you look at the complaint at some points, it looks like it was broader. If you look at just the consent decrees that did allow certain types of insurance products to be made to the NRA, but not the affinity insurance products. But I don't think any of that really your honor, because what you have here is the DFS essentially going to the service providers of a speech organization and saying, look, unless you stop providing this certain set of important services to this organization, because I don't like their speech, I am going to investigate you for other things that I ordinarily wouldn't care about. Suppose for example, this involved Texas's department of financial services, and they went to the service providers of Planned Parenthood of America. And they said, you know what? We really hate Planned Parenthood speech, and we want to shut it down. I see you're engaging in these technical infractions that I don't ordinarily care about. Well, what I do care about is Planned Parenthood speech. And so unless you cut off these business services to Planned Parenthood, I'm going to investigate you for these other things. No reasonable official would think that that's allowed. Yet that is what the and what I was going to point you to your honor is this court's language from the equity decision back in 2003. So Francisco, yes, yes. I'm trying to ask a question. The question is whether there was clearly established law at the time as Lula engaged in these actions. And the Supreme Court, of course, relies on Bantam Books. Bantam Books was literally about book banning, you know, and some of the other cases were involved direct incursions on speech, discontinuing the publication of a newspaper, taking down a billboard, etc. Isn't the conduct here a little bit different? If there wasn't a direct incursion on speech, as Justice Jackson suggested, here was a little more attenuated. How do you respond to that? Sure, your honor. I have two responses to that. The first is where I was going to point you to is the court's 2003 decision in the equity case where this is what you wrote. A public official who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights regardless of whether the threatened punishment comes in the form of the use of the defendant's direct regulatory authority of the plaintiff or in some less direct way. Mr. Francisco, Mr. Aquetti had to do with a billboard. He was posting language and much more direct in the same way as Judge Chin is pointing out that Bantam is. I'm having difficulty seeing directly what speech of the NRAs was suppressed or is even alleged to have been suppressed by Ms. Vullo's actions at a step further removed from service providers. You've planned parenthood and service providers, but I'm not seeing a case about Aquetti involved who owned the billboard, but we're talking directly about making that speech available to the public in a way that seems to me somewhat different from here. Am I wrong? I do think you're wrong, your honor. A couple of responses. The first is suppose Ms. Vullo's counsel at DFS had given her that quote that I just gave her from Aquetti. Then she sat back and said, I really want to hear the NRA speech. Given this Aquetti decision, can I go to the NRAs insurance providers and say, look, unless you help me suppress their speech by cutting ties with them, I'm going to engage in adverse regulatory action against you. Respectfully, I don't think any reasonable official after having read Aquetti would think that. Put that to the side. I think that another case that's quite on point here is the Seventh Circuit's decision in Backpage.com, which likewise involved a threat to the service providers of Backpage.com, the credit card companies. As this court said in Hornigan-Stevenson, out-of-circuit precedent is relevant when you're addressing the qualified immunity analysis. Here, we don't really have an unclear rule. Does it make any difference to your analysis that as reflected in the consent decrees, the insurers with the NRA had been engaging in unlawful insurance, insuring against liability for intentional or reckless misuse of firearms to the injury of individuals. That was established in a series of consent decrees. So the context is a little bit different, I think, isn't it? I don't think so, Your Honor, for a couple of reasons. The first is I think that the Supreme Court rejected that reading of the complaint. Here's what it said. It said, simply credit Vulo's assertion that pursuing conceded violations of law is an obvious alternative explanation for her actions that defeats the plausibility of any coercive threat stating First Amendment concerns. So what it was saying is that you have to credit our allegation that she was acting specifically in order to punish our speech, as the Supreme Court said, in order to punish or suppress the NRA's gun promotion advocacy. And once you accept that, the lines are very clear. When your goal is to suppress speech, you can do that through persuasion, but you cannot do that through coercion. And the Supreme Court made clear that, properly read, our complaint puts Ms. Vulo in its allegations squarely. You mentioned Backpage. Again, there, that was a direct incursion on speech blocking ads. But here there's... Your Honor, it wasn't. Well... It was an action against the credit card companies saying we don't want you to provide credit card services to people who want to post ads. They could still post ads. They just couldn't use those credit card companies to do it. But ultimately, it was about posting ads and speaking. The question, is there a case like this one where the government official, in the course of trying to further policy as dictated by the governor of the state, puts pressure on regulated entities to discontinue doing business with a company that was admittedly engaging in illegal practices? Is there a case like that? I think that is exactly what was happening in Backpage. I think that's what the Supreme Court said was also happening in Bantham Books. But I'd also make the point that the line is very clear that the one thing you cannot do if your goal is to suppress speech is to try to further that goal by pressuring third parties that you regulate to help you do it. That is the clear line. Otherwise, for example, in my hypothetical about the Department of Financial Services of Texas going to Planned Parenthood's service providers and said, look, we want to choke off their speech, that would also not be clearly established. But Bantham Books makes clear that when you're trying to suffocate the speech—sorry, Your Honor. Yeah, sorry. This goes back to my question. You told me early on it doesn't really matter. But it actually does, given what you're saying. It matters to me to understand what the nature is of the insurance that the insurers were asked not to provide. Is it your contention that the affinity, co-branded, whatever you call them, insurance programs are speech, and that therefore cutting off those programs is cutting off speech? No, Your Honor. I think what our argument is more like the Backpage.com argument, where you're trying to choke off the revenue that is used to generate speech. And so to quote Akwetey, you're trying to indirectly use your regulatory authority to choke off speech. So the theory is that those co-branded insurance products are a source of revenue for the NRA. So if they can choke off the availability of those products, it will choke off the NRA's undermined speech? Well, I think it's really two things, Your Honor. I do think that when you co-brand a product, that is speech too. So I think that in answer to your previous question, yes, I would say that the co-branded product is a form of speech that you're choking off. But I also think that when you're choking off revenue to punish an organization because they engaged in speech, that is an equally clear violation of the First Amendment. And here, I think that we've adequately alleged both of those things. Was co-branding in your complaint as a form of speech? Your Honor, I think that our complaint generally alleges a violation of the First Amendment based on all of these things. I think the co-branding is in there because that's what they were going after, Affinity Insurance Programs. But even if you disagreed with me on that, I think what Backpage makes clear, and this was the words of Judge Posner, when you're trying to essentially suffocate the speech by depriving it of oxygen, by depriving the organization of the revenues that come from advertisements, that is an equally established violation of these basic principles. So the bottom line here is I think that what the Supreme Court made clear in its decision, Judge Robinson, as you were saying, wasn't that the court misunderstood the law, it was that it misread the complaint. And properly read, what this complaint alleges is that Ms. Vullo had the specific intention of shutting down the NRA speech. And the way that she went about doing that was threatening adverse regulatory action against regulated parties in order to enlist their support in furtherance of that goal. With all due respect, no reasonable official would think, it is permissible for me to threaten regulated parties with adverse action unless they help me shut down somebody else's speech, which is precisely what the court said we alleged in this complaint. Before we lose you, can you address the absolute immunity argument, right? There's this argument kicking around that, well, if there's not qualified immunity, then what you're really going after is enforcement decisions by a regulatory enforcer, and that's a category of actions that's absolutely immune. What's the answer to that? So I think my most direct answer is the one that the Supreme Court gave. They have never raised an absolute immunity argument with respect to the First Amendment claims. They've never raised them with respect to anything other than the consent decree. They certainly have never raised them with respect to the Lloyds meeting. So it is certainly not before this court right now. They want to try to raise it later, so be it. We'll deal with it back on remand, but it is simply not before this court. And could you help me clarify your claims about retaliation? Because it seemed intertwined with selective enforcement as well as First Amendment, and they seemed somewhat muddled. If you could clarify for me what you are pressing now. Sure, Your Honor. I mean, the three basic elements of retaliation that you have protected speech, you've got adverse action, and you've got a causal connection between the two. Here, the NRA in protected speech, I think everybody agrees with that. Here, we have alleged that she engaged in adverse action against regulated parties in order to suppress our protected speech. That's what the Supreme Court said. You have to read into this complaint. And third, we've clearly alleged a causal connection between the two. The reason she acted against us is because of our protected speech. So this is not retaliation or selective enforcement. That's just a straight amendment claim. Yeah. Well, the selective enforcement claim was dismissed in the court. We haven't yet had an opportunity to appeal that. But yeah, this is the censorship claim and the retaliation First Amendment claim. Okay. Thanks. The only last point I think I would point you to is the Erdi case, Your Honor, which is a Fourth Amendment excessive force case that involved the use of a sound gun. This court rejected qualified immunity, even though no court had ever held that use of sound amplification could constitute the use of excessive force. The reason that's important is because the court made clear that just because you come up with a slightly different way to violate somebody's rights doesn't mean you're entitled to qualified immunity. Here, we've got a clear line between coercion on the one hand and persuasion on the other. We have clearly alleged that she's on the coercion side of the line, as the Supreme Court found, and therefore, she should not be entitled to qualified immunity. Thank you. Appreciate it. And we'll hear rebuttal from Mr. Happerman. Thank you, Your Honors. I'd like to make four points, if I may. The first, Judge Robinson, in response to your question about absolute immunity, absolute immunity is preserved in this court. We think it's fair game for this court to address it. And we think, I think, in response to Judge Carney's question to Mr. Francisco, perhaps part of the difficulty here is in sort of the muddled nature of the distinction between the First Amendment claim and the Selective Enforcement claim. But nonetheless, even if the court doesn't reach absolute immunity, I think absolute immunity helps to explain why qualified immunity is warranted, why you don't have any case law addressing a fact pattern that's remotely like this one. And that's because, by and large, when you have allegations like these about, you know, leniency in exchange for cooperation, terms of a consent decree and the like, those are allegations that would be protected by absolute immunity. The second point I'd like to make, this is in response to questions that were asked by Judge Chin and Judge Carney. I think I did not hear an answer to the question of whether there is a case like this one involving conduct that was attenuated from speech in the way that this acquitted, which was a billboard. He pointed to Backpage, which was websites that involved protected speech. And Judge Carney, in response to your question, I have read the complaint carefully. I did not see any suggestion that the insurance products themselves were protected speech in the complaint. So let me let me let me just ask you the hypothetical that we had, right, the Texas attorney general going to a service provider. And let's say it's a kind of an essential service provider and saying, if you continue to do business with Planned Parenthood, we're going to take some sort of adverse action against you with the intent of squeezing Planned Parenthood. It's kind of a long game. It's not a immediately the speech goes away. Is that too attenuated as well, or at least under laws that existed at the time that we're looking at, would that be too attenuated? I think under law as it existed at the time, it would be attenuated. And you also have, of course, the additional point that there in that hypothetical, I don't understand the target of the enforcement action to have been engaged in conceitedly unlawful conduct with Planned Parenthood, which is what we have here. And just to quote the prior opinion in this case, you know, this court could find no case where a government official urged an entity to cut ties with what is essentially its accomplice during an investigation into conceitedly unlawful conduct. So that's another distinction. You're quoting to us from a decision that the Supreme Court unanimously vacated rather than quoting to us from the Supreme Court's description of the facts. That's one of the things I'm struggling with a little bit is we don't, do we have to, do we have to cling to that description in order to rule in your favor? No, I don't think you have to cling to that description. And I think, of course, it's appropriate in light of the Supreme Court's decision in this case to take another look at qualified immunity. But the point, the key point is that when you look at qualified immunity in light of the Supreme Court's decision in this case, this court's reasoning and its prior opinion holds. And there was no case that this court could identify that would put an official on notice that their conduct was unlawful. And I think this gets to a really important point, sort of the underlying purpose of qualified immunity, Judge Robinson, is to ensure that have fair notice. And as I started the argument by noting, and I didn't hear a real response from Mr. Francisco, you know, a unanimous panel of this court looked at the same complaint and concluded that there was no constitutional violation. And the chilling effect on a public official who may or may not be a lawyer, who is not steeped in First Amendment law, the idea, you know, Mr. Francisco has to persuade you not just that that was a reasonable mistake, but it was a mistake that was so unreasonable. But it's the kind of mistake that ought to subject a public official to money damages and years and years of litigation. And I don't think that their argument has come close. Thank you. For those reasons, we urge you to reaffirm qualified immunity. All right. If there's no further questions from my colleagues, we'll go ahead and call it. We'll take it under advisement. And we thank everybody for being here. Thank you. Thank you. Thank you. Fourth sentence adjourned.